UNITED STATES DISTRICT COURT
EASTERN DISTRICT, SOUTHERN DIVISION
OF MICHIGAN

WILLIE SMITH,
Personal Representative of the
Estate of Kelly Snider Smith, Deceased,

Plaintiff,

v

Case No: 00-71459
HON: Avern Cohn
Magistrate Judge Goldman

BOTSFORD GENERAL HOSPITAL, a Michigan
Non-Profit Corporation,

Defendant.
_____/

| | |
|---|---|
| MARC LIPTON (P43877) | LINDA M. GALBRAITH (P30781) |
| JODY LIPTON (P49001) | JEFF FEIKENS (P42816) |
| LIPTON LAW CENTER, P.C. | Attorneys for Defendant |
| 18930 W. 10 Mile Rd. #3000 | 700 First National Bldg. |
| Southfield, MI 48075 | 660 Woodward Ave. #700 |
| (248) 557-1688 | Detroit, MI 48226-3516 |
| | (313) 962-5909 |

---

**PLAINTIFF'S ANSWER TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by counsel, Marc Lipton, pursuant to F.R.Civ.P. 56(c), answers

Defendant's motion for summary disposition. For the reasons presented in the attached

brief in opposition to Defendant's motion, Plaintiff presents a genuine issue of material fact

that Defendant violated EMTALA, 42 U.S.C. § 1395dd, by transferring the decedent before

stabilizing his emergency medical condition. Defendant raises no valid exception that

excuses its failure to stabilize the decedent.

1

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny Defendant's motion for summary judgment.

Respectfully submitted,

MARC LIPTON (P43877)
Attorney for Plaintiff
18930 W. 10 Mile Rd. #3000
Southfield, MI 48075
(248) 557-1688

Dated: January 4, 2002
federal/motionOppMSJ

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT, SOUTHERN DIVISION
## OF MICHIGAN

WILLIE SMITH,
Personal Representative of the
Estate of Kelly Snider Smith, Deceased,

        Plaintiff,

v

                                    Case No: 00-71459
                                    HON: Avern Cohn
                                    Magistrate Judge Goldman

BOTSFORD GENERAL HOSPITAL, a Michigan
Non-Profit Corporation,

               Defendant.

_____/

| | |
|---|---|
| MARC LIPTON (P43877) | LINDA M. GALBRAITH (P30781) |
| JODY LIPTON (P49001) | JEFF FEIKENS (P42816) |
| LIPTON LAW CENTER, P.C. | Attorneys for Defendant |
| 18930 W. 10 Mile Rd. #3000 | 700 First National Bldg. |
| Southfield, MI 48075 | 660 Woodward Ave. #700 |
| (248) 557-1688 | Detroit, MI 48226-3516 |
| | (313) 962-5909 |

_____/

## BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

## QUESTIONS PRESENTED

I.  WHETHER THE DECEDENT'S DIAGNOSED "OBVIOUS," OPEN, COMMINUTED, DISTAL LEFT FEMUR FRACTURE WAS CLEARLY AN EMERGENCY MEDICAL CONDITION REQUIRING STABILIZATION UNDER EMTALA; WHETHER DEFENDANT ALSO HAD ACTUAL KNOWLEDGE OF THE DECEDENT'S SEVERE BLOOD LOSS AT THE TIME OF TRANSFER.

II.  WHETHER AMPLE EVIDENCE RAISES A MATERIAL FACT QUESTION THAT DEFENDANT TRANSFERRED THE DECEDENT WITHOUT STABILIZING HIS EMERGENCY MEDICAL CONDITION.

III. WHETHER DEFENDANT DID NOT SATISFY EITHER THE WRITTEN CONSENT OR WRITTEN TRANSFER CERTIFICATION EXCEPTIONS PERMITTING TRANSFER OF AN UNSTABLE PATIENT.

i

## CONTROLLING AUTHORITY

**ISSUE I**

42 U.S.C. § 1395dd(c)(1)(A)

Urban by Urban v. King,
      43 F.3d 523 (10th Cir. 1994)

**ISSUE II**

42 U.S.C. § 1395dd(c)(3)(A)

**ISSUE III**

42 U.S.C. § 1395dd(c)(1)

## INTRODUCTION

Defendant moves for summary judgment, arguing that Plaintiff does not raise a genuine issue of material fact on his claim that Defendant violated EMTALA, 42 U.S.C. § 1395dd, by transferring the decedent, Kelly Snider Smith, before stabilizing his emergency medical condition. Defendant's motion is devoid of merit.

It is uncontested that Defendant's doctors diagnosed the decedent as having an open, comminuted distal fracture of his left femur. (Defendant's Exhibit # 2, p. 13). Virtually every testifying medical witness in this case, including Defendant's witnesses, confirm that the decedent's severe femur fracture was an emergency medical condition that created a life-threatening risk of blood loss. Contrary to Defendant, evidence also raises a material fact question that it had actual knowledge of the decedent's blood loss and hemorrhagic shock.

Moreover, evidence establishes that Defendant violated EMTALA by discharging decedent without stabilizing his emergency medical condition. Defendant's own records, the testimony of Paramedic Amy Ellison and other witnesses and autopsy findings conclusively rebut Defendant's self-serving claim that the decedent was stable when transferred. Instead of "stabilizing" the decedent, the Defendant stood by while his vital signs dramatically deteriorated, while the decedent and his fracture were not properly immobilized, and while the decedent continued to bleed to death - both internally and externally. Ample evidence raises a material fact question that Defendant violated EMTALA by transferring the decedent when not stable.

Finally, Defendant's argument that it obtained consent for, or properly certified the decedent's transfer is spurious. EMTALA's transfer request and certification requirements were neither complied with nor applicable. Defendant's motion for summary judgment must be denied.

1

## COUNTER-STATEMENT OF FACTS

Though Defendant moves for summary judgment under F.R.Civ.P. 56(c), its motion does not even come close to presenting all material facts in the light most favorable to Plaintiff. Instead, Defendant presents only selected facts slanted in its favor. Even more, in violation of this Court's pretrial order, Defendant's summary judgment motion does not present undisputed material facts "in separate numbered paragraphs". Accordingly, Plaintiff must present the complete material facts.

The decedent was involved in a motion vehicle accident at approximately 2:30 a.m. on October 10, 1998. Detroit EMS noted that the decedent complained of pain in his upper abdomen and left thigh. (Defendant's Exhibit # 2, p. 2). They found a "left open femur fracture". (Id). During transport to Botsford Hospital, the decedent's pulse was 96 and his respiration was 26. Defendant omits the important fact that EMS reported the decedent's skin condition as "warm, dry (and) normal". (Id).

The decedent arrived at Defendant Botsford at 3:03 a.m. (Id). Dr. Frank Schell primarily attended to the decedent. Schell and intern Catherine Loniewski immediately diagnosed "an obvious open femur fracture to the left". (Id, p. 3). Orthopedic consultant Moti confirmed that the decedent suffered on "open left comminuted distal femur fracture". (Id, p. 13). X-rays also confirmed this. (Schell dep. pp. 31-32, Exhibit # 1). Defendant's records show at least one open wound where the broken bone punctured the decedent's skin. (Defendant's Exhibit # 2, p. 13).

In arguing that the decedent had no diagnosed emergency medical condition, Defendant disingenuously omits that nearly every testifying medical witness concedes that an open comminuted distal femur fracture is potentially life-threatening and therefore an emergency medical condition. (Bitterman dep, pp. 99, 171-172, 217-218 - Exhibit # 2; Demeo dep, pp. 85, 87 - Exhibit # 3; Schell

2

dep, p. 35 - Exhibit # 1; Moti dep, pp. 63-64 - Exhibit # 4; Dragovic dep, pp. 54-56, 59 - Exhibit # 5; Aranosian dep, p. 65 - Exhibit # 6). This includes Defendant's treating doctors (Schell and Moti) and Defendant's experts (Dragovic and Aranosian)

Indeed, Defendant's own expert, Ljubisa Dragovic, M.D., specifically admits that the decedent's injury "is an injury that has a serious risk of dying in and of itself". (Dragovic dep, p. 59 - Exhibit # 5). Hemorrhaging "is one of the most important aspects of it". (Id). In noting that a fractured femur is potentially fatal, Dr. Dragovic adds that the decedent's fracture presented an even greater risk of blood loss. This is because his fracture was open, comminuted and broken mid-shaft (distal). (Id, pp. 54-56). A mid-shaft femur fracture creates "more chance to injure the surrounding vasculature". (Id, p. 55). Defendant's claim that its doctors did not diagnose the decedent as suffering an emergency medical condition is therefore false.

Defendant first recorded the decedent's vital signs at 3:15 a.m. (Defendant's Exhibit # 2, p. 8; Phelps dep, p. 9 - Exhibit # 7). These were: pulse 120, respiration 18, blood pressure 139/65, and pulse oxygen on room air at 100%. (Id, pp. 17, 26-28). At 120, the decedent's heart rate had increased since the EMS run. It was now tachycardic. (Id).

Defendant inserted two IV's and a Foley catheter. (Id, pp. 13-14, 18). From 3:45 a.m. until discharge, Defendant gave the decedent saline with the IV wide open. (Id, pp. 21, 31, 52). Nurse Phelps estimates that the decedent received over 3000 ccs of fluid. (Id, pp. 52-53). Despite this, throughout his stay at Defendant, the decedent produced no urine through the catheter. (Id, pp. 18, 19, 21-22, 32, 51). With the catheter unobstructed and the decedent receiving substantial fluids, Nurse Phelps was concerned that he produced no urine. (Id, pp. 19, 51). She told Dr. Schell and Dr. Loniewski that the decedent was not producing urine. (Id, p. 19, 45, 55). It is uncontested that lack

3

of urine output is a sign that the patient may have lost so much blood that his kidneys have shut down. (Id, p. 64; Aranosian dep, p. 83 - Exhibit # 6, Demco dep, p. 74 - Exhibit # 3).

At 3:30 a.m., Dr. Schell decided to transfer the decedent to U of M Hospital. Defendant called U of M Hospital, gave it the decedent's vital signs as of 3:30 a.m. and requested a transfer. (Kronick dep, pp. 14-18 - Exhibit # 8). Based on the information received at 3:30 a.m., Dr. Kronick of U of M believed the decedent was acceptable for transfer. (Id, p. 19). U of M agreed to Defendant's request. (Id). It is uncontested that, before the decedent's arrival at U of M at 6:25 a.m., Defendant did not update U of M on the decedent's condition. (Id, p. 20).

From 3:30 a.m. to his discharge at 5:40 a.m., the decedent's condition substantially deteriorated. Mr. Smith remained restless and agitated throughout his stay. (Defendant's Exhibit # 2, pp. 7-9). Though Defendant describes the decedent as uncooperative, it is uncontested that restlessness and agitation are yet another sign of serious blood loss/hemorrhagic shock. (Schell dep, p. 115 - Exhibit # 1; Aranosian dep, p. 83 - Exhibit # 6; Bitterman dep, p. 167 - Exhibit # 2).

Defendant asserts that it "provided traction and immobilized" the decedent's femur. (Defendant's brief, pp. 1-2). Defendant omits, however, that even after splinting, the decedent continued to move. (Schell dep, pp. 55, 57 - Exhibit # 1; Moti dep, p. 75 - Exhibit # 4). With the jagged edges in the decedent's mid-shaft fracture, constant movements only exacerbates injury to blood vessels. (Dragovic dep, pp. 53-56 - Exhibit # 5; Bitterman dep, pp. 97-99 - Exhibit # 2).

At 3:45 a.m., Nurse Phelps charted that, when the decedent changed position of his leg, it was "spurting" a "large amount" of blood. (Phelps, dep, p. 45 - Exhibit # 7; Defendant's Exhibit # 2, p. 8). She estimates that, at this time, the decedent externally lost 300 ccs of blood. (Id, pp. 45-46). Phelps testifies that she controlled the bleeding with a pressure dressing. (Id).

4

The "large amount" of external bleeding Nurse Phelps observed did not include his internal bleeding. Dr. Bitterman explains that, according to standard textbooks, even with stabilization and no patient movement, a patient always loses 1 ½ - 2 liters of blood with a broken femur. (Bitterman dep, p. 88 - Exhibit # 2; see also Schell dep, pp. 93, 121 - Exhibit # 1). The decedent's constant movements only exacerbated his blood loss. (Bitterman dep, pp. 88-89 - Exhibit # 2). Plaintiff's size and increased fatty tissue caused even more internal bleeding. (Demeo dep, pp. 45-46 - Exhibit # 3). Defendant's expert Dr. Aranosian estimates that, by 3:30 a.m., the decedent had anywhere from 1500-3000 ccs of blood in his thigh - as much as 25% of his total volume. (Aranosian dep, p. 62 - Exhibit # 6).

The decedent's vital signs began dropping. At 4:10 a.m., his pulse increased to 126 and blood pressure dropped to 101/67. (Phelps dep, p. 36, 38 - Exhibit # 7; Defendant's Exhibit # 2, p. 8). Nurse Phelps admits that a rising pulse rate can be consistent with blood loss. (Id, p. 38; see also Aranosian dep, pp. 71, 83 - Exhibit # 7; Bitterman dep, pp. 91-92 - Exhibit # 3; Loniewski Dep, pp. 168, 174 - Exhibit # 9). At 4:35, the decedent's pulse increased again to 132. (Defendant's Exhibit # 2, p. 9). His respiration nearly doubled to 32. (Id). Nurses charted two blood pressure readings - 76/55 and 105/55. (Id).

Defendant repeatedly argues that, due to the decedent's size and alleged lack of "cooperation," the blood pressure readings were not accurate. In doing so, Defendant omits Nurse Phelps' clear testimony that the charted blood pressure readings were not inaccurate. (Phelps dep, p. 39 - Exhibit # 7; see also Loniewski, pp. 89, 90, 113, 116, 120 - Exhibit # 9). She specifically testifies that "I would not have allowed it to be on the record if I thought it was inaccurate, because I was monitoring his vital signs". (Phelps dep, p. 39 - Exhibit # 7).

5

By 5:05, the decedent's pulse rate increased to 133. (Defendant's Exhibit # 2, p. 9).  His blood pressure dropped to 71/39.  (Id).  Nurse Phelps noted that the decedent was uncooperative, thrashing about, still producing no urine (after nearly two hours of a wide open saline IV) and that all four of his extremities were cool.  (Phelps dep, p. 59 - Exhibit # 7).  She admits that cool extremities can be a sign of hypovolemia.  (Id, p. 60).  The decedent's blood pressure at 5:15 was 71/50.  (Id, p. 41).  The decedent also had diminished radial pulses - another sign of hypovolemia. (Schell dep, pp. 97, 102 - Exhibit # 1).

Despite the decedent's prior external bleeding, continued thrashing about, restlessness, agitation, high pulse rate, erratic respiration, no urine output, dropping blood pressure, diminished radial pulses and cooling extremities, Dr. Schell decided not to give him blood.  (Schell dep, p. 88 - Exhibit # 1).  Schell admits that, if accurate, the decedent's charted deteriorating vital signs "would reflect a hypotensive patient" consistent with "hypovolemia".  (Id, pp. 72, 74; see also Loniewski Dep, pp. 165, 166, 168, 174 - Exhibit # 9).  Though Nurse Phelps testifies that the blood pressure readings were accurate, Dr. Schell disregarded them.  (Id, p. 63, 68).  He maintained that the decedent only had "minimal" blood loss and went ahead with his plan to transfer the decedent to U of M Hospital.  (Id, pp. 68-69).

At 5:21 a.m., Paramedics Amy (Zappa) Ellison and Jennifer Erwin received a call at their station to transport the decedent from Defendant to U of M Hospital.  (Ellison dep, I, pp. 26-27 - Exhibit # 10).  They were told that this was a priority three run - a non-emergency.  (Ellison dep, II, pp. 19-20 - Exhibit # 11).

The paramedics arrived at Botsford hospital at 5:30 a.m.  (Id, p. 18).  When she went into the trauma room, Ellison initially found the decedent "extremely agitated," restless and anxious and complaining of difficulty breathing.  (Ellison dep, I, p. 37 - Exhibit # 10).  She notified Dr. Schell

6

of the decedent's breathing complaints. Schell responded that the decedent "needs to go ... so let's

get going". (Ellison dep, II, p. 30 - Exhibit # 11).

Ellison proceeded to take the decedent's vital signs. She could only obtain a blood pressure

of 70 systolic with no diastolic. (Ellison dep, II, pp. 43-44, Exhibit # 11). The decedent' pulse was

120 and "weak". (Id, p. 46). His respiration was 34 and labored. (Id, p. 47). His skin was cool,

dry and pale. (Id, p. 48). Ellison believed this indicated a possible circulation problem. (Id, pp. 48-

49). The decedent's pulse oxygen level, now with a mask, was down to 93%. (Exhibit # 15).

Even more, contrary to Defendant's records, Ellison found blood oozing from two (not one)

leg wounds. (Ellison dep II, p. 50 - Exhibit # 11). She found no pressure dressing on the decedent's

wounds. (Ellison dep I, p. 68 - Exhibit # 10). She testifies there were "copious amounts of blood

oozing from both wounds". ( Id, p. 42). The decedent's aunt, who recently arrived, found decedent

"very agitated" and his sheet full of blood. (Perryman dep, pp. 51-52, 54, 59-60 - Exhibit # 12).

In addition, contrary to Defendant's allegation that it had "immobilized the femur", when she

palpated his leg, Ms. Ellison felt the bone "snapping and popping around". (Ellison dep II, p, 62 -

Exhibit # 10). She testifies that "I could feel the bone moving around ... [a]lmost like a grinding

kind of". (Id).

Ellison immediately applied a pressure dressing to both bleeding leg wounds. (Id, p. 50).

Dr. Schell was aware that the decedent had two bleeding wounds. (Id, p. 52).

Despite her efforts, Ellison could only control the bleeding from one wound, not the other.

(Id, p. 62). Moreover, when she released the dressing from the one controlled site, it too started to

bleed again. (Id). Ellison told Dr. Schell she could not control the decedent's bleeding. (Id).

7

Meanwhile, Defendant's staff was trying to get a blood pressure from the decedent. (Id, p. 64). They could not do so. (Id).

At this point, based on his poor vital signs, labored breathing, "grinding," "snapping" and "popping" femur and copious bleeding, Ms. Ellison concluded that the decedent's condition was "unstable". (Ellison dep I, pp. 72-73, 75, 83-84, 86 - Exhibit # 10). She recognized the decedent's symptoms as consistent with hemorrhage shock. (Ellison dep II, pp. 66, 69 - Exhibit # 11). Ellison specifically told Dr. Schell that she was not sure the patient was stable for transport. (Id, p. 66). Schell replied that the "patient must go and go now". (Ellison dep I, p. 76 - Exhibit # 10). He told Ellison to unlock the decedent's stretcher and take him out. (Ellison dep II, p. 70 - Exhibit # 11).

As they wheeled the decedent out to the ambulance, Amy Ellison continued to apply pressure dressings to his wounds. (Id, p. 71). Her report indicates that the decedent was "still hemorrhaging copious amounts of blood". (Id, p. 72). Ellison estimates witnessing 500 ccs of blood loss. (Id). The decedent's sister heard a paramedic ask her brother to lay still because he was "bleeding". (Smith dep, pp. 6, 58 - Exhibit # 13).

Once the decedent was placed in the ambulance, Ellison started using towels to try and control the bleeding. (Ellison dep II, pp. 74-75 - Exhibit # 11). One towel became completely blood-soaked, another partially soaked. (Id). The decedent's sister, who came out to the ambulance, saw him "bleeding from his leg". (Smith dep, p. 58 - Exhibit # 13). She also confirms seeing a blood-soaked towel Paramedic Ellison used to try and stop the bleeding. (Id, pp. 58, 65).

Ellison asked her partner to go get Dr. Schell. She told Schell, once again, that "the patient's wound won't stop bleeding ... it's still gushing blood when I release pressure". (Ellison dep II, p. 80 - Exhibit # 11). Ellison also felt the decedent's bones moving around "every time he moved his leg". (Id, p. 82). She asked Schell for help stopping the bleeding and for something to sedate the

8

decedent - who was "extremely agitated". (Id, p. 81). She felt that if she could just get him to stop moving his leg, she might get the bleeding stopped. (Id, p. 82). Dr. Schell replied that there was not much he could do now and that the decedent had to go to U of M. (Ellison dep I, p. 92 - Exhibit # 10).

Despite the urgency, the paramedics could not leave yet. A Botsford nurse instructed them to wait for x-rays. (Ellison dep II, pp. 79-80 - Exhibit # 11). Ellison and her partner waited "a minimum of fifteen minutes" before receiving the x-rays and departing. (Id).

When they finally departed at 5:53 a.m., Ms. Ellison changed what Defendant originally designated as a non-emergency to a priority one transport. (Id, pp. 94-95, 112). Driver Erwin proceeded to U of M with lights and siren on. (Id).

During the transport, the decedent's heart rate began dropping. (Id, pp. 108, 117-118). Ellison asked her partner to call for another ambulance. (Id, p. 103). After not diverting to St. Mary Hospital, at approximately 6:15 a.m., driver Erwin pulled over on M-14 and met another ambulance. (Id, pp. 113, 117-119). As Ellison and a new paramedic began CPR, Ellison continued to U of M Hospital. (Id). They arrived at 6:25 a.m. (Id, p. 181).

U of M doctors could find no pulse or blood pressure. (Kronick dep, p. 37 - Exhibit # 8). Despite U of M's resuscitation efforts, Kelly Snider Smith was pronounced dead at 7:23 a.m. (Defendant's Exhibit # 5, p. 1).

In noting that U of M doctor Kronick did not report Defendant as violating EMTALA, Defendant omits Dr. Kronick's testimony that he did not report Defendant because he only knew of the decedent's condition at 3:30 a.m. - not when transferred two hours later - (Kronick dep, pp. 93-95, 97-98 - Exhibit # 8). Defendant also omits Dr. Kronick's testimony that the paramedics specifically told him "they were uncomfortable with the transfer". (Id, p. 64).

9

The autopsy revealed that the decedent suffered both "complex" left femur and "simple" pelvic fractures. (Defendant's Exhibit # 5, p. 8). Washtenaw County Medical Examiner Bader Cassin, M.D., concluded that the decedent's cause of death was "[h]emorrhage from left leg fractures". (Id, p. 1).[1] Though noting a pelvic fracture, the autopsy did not indicate that the decedent died from blood loss relating to that fracture. (See also Spitz dep, pp. 22-24 - Exhibit # 14).

Defendant's own expert, Dr. Dragovic, agrees that Mr. Smith died of blood loss after going into hypovolemic shock due to his femur fracture. (Dragovic dep, pp. 13, 49 - Exhibit # 5). This was a "direct complication" of his leg injury. (Id, p. 42). Dr. Dragovic concludes that the decedent became hypotensive at 4:10 a.m. (while at Defendant) due to blood loss. (Id, pp. 29-30, 42).

Finally, Defendant notes that there was no "improper motive" in transferring the decedent. Defendant omits that the Supreme Court recently held that a plaintiff need not show improper motive in an EMTALA claim. Roberts v. Galen, - U.S. -, 119 S.Ct. 685 (1999).

## ARGUMENT

I.  **THE DECEDENT'S DIAGNOSED "OBVIOUS," OPEN, COMMINUTED, DISTAL LEFT FEMUR FRACTURE WAS CLEARLY AN EMERGENCY MEDICAL CONDITION REQUIRING STABILIZATION UNDER EMTALA. DEFENDANT ALSO HAD ACTUAL KNOWLEDGE OF THE DECEDENT'S SEVERE BLOOD LOSS AT THE TIME OF TRANSFER.**

Defendant erroneously argues that it did not have actual knowledge that the decedent suffered from an emergency medical condition under EMTALA. Defendant admits diagnosing the decedent with an "obvious" open, comminuted distal left femur fracture. It is undisputed that this fracture was

---

[1]     Contrary to Defendant, the decedent did not have 31 mgs/ml of cocaine in his system. (Defendant's brief, p. 3). The decedent had 31 ng/ml of cocaine. (Id, final page). Neither cocaine nor alcohol contributed to the decedent's blood loss and death. (Spitz dep, pp. 22-23, 26-29, 45 - Exhibit # 14).

potentially life-threatening, raised a risk of serious blood loss, and was an emergency medical condition. Even more, contrary to Defendant's claimed ignorance of the decedent's severe blood loss, both the hospital chart and eyewitness testimony establish that Defendant knew that he was bleeding and going into hemorrhagic shock.

Summary judgment may be granted under Fed.R.Civ.P. 56(c) only when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Id. In ruling on a motion for summary judgment, the Court "must view the evidence in the light most favorable to the non-moving party". Employers Ins. of Wausau v. Petroleum Specialists, Inc., 69 F.3d 98, 101 (6th Cir. 1995). The motion can be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party". Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Overwhelming evidence raises a genuine issue of material fact that Defendant had actual knowledge that the decedent had an emergency medical condition requiring stabilization under EMTALA.

EMTALA, 42 U.S.C. § 1395dd, "imposes a series of obligations on a hospital emergency department". Jackson v. East Bay Hosp., 246 F.3d 1248, 1254 (9th Cir. 2001). Pertinent to this case, if the Defendant hospital detects an emergency medical condition, it may not transfer the patient before stabilizing him within the meaning of the Act. Id; Thornton v. Southwest Detroit Hosp., 895 F.2d 1131, 1133 (6th Cir. 1990). EMTALA defines an "emergency medical condition" as:

> A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -
>
> (i)     placing the health of the individual ... in serious jeopardy,
>
> (ii)    serious impairment to bodily functions, or
>
> (iii)   serious dysfunction of any bodily organ or part.

11

42 U.S.C. § 1395dd(e)(1)(A); Thornton, supra at 1133-1134.

42 U.S.C. § 1395(e)(1) "requires some manifestation of acute symptoms so the hospital would know of the (emergency medical) condition". Urban by Urban v. King, 43 F.3d 523, 526 (10th Cir. 1994). To succeed in a failure to stabilize claim, "the plaintiff must prove the hospital had actual knowledge of the individual's unstabilized emergency medical condition". Id.

Compelling evidence proves that Defendant had actual knowledge that the decedent suffered from an emergency medical condition. In noting that it did not specifically diagnose hemorrhagic shock, Defendant disingenuously avoids the uncontested fact that it specifically diagnosed that the decedent had an "open left comminuted distal femur fracture". (Defendant's Exhibit # 2, p. 13). Defendant's doctors Schell and Loniewski even described this fracture as "obvious". (Id, p. 3). Defendant's records also confirm at least one site where the decedent's broken femur punctured the skin. (Id, p. 13).

With this "obvious" diagnosis, Defendant clearly had actual notice that the decedent had an emergency medical condition. The medical witnesses in this case, including Defendant's witnesses, universally testify that an open comminuted distal femur fracture presents a potentially life-threatening risk of hemorrhaging and is therefore an emergency medical condition. (Bitterman dep, pp. 99, 171-172, 217-218 - Exhibit # 2; Demco dep, pp. 85-87 - Exhibit # 3; Schell dep (Defendant), p. 35 - Exhibit # 1; Moti dep (Defendant), p. 63 - Exhibit # 4; Dragovic dep (Defendant), pp. 54-56, 59 - Exhibit # 5; Aranosian dep (Defendant), p. 65 - Exhibit # 6).

Even more, as indicated above, Defendant's own expert, Dr. Dragovic, specifically admits that the decedent's fracture "is an injury that has a serious risk of dying in and of itself". (Dragovic dep, p. 59 - Exhibit # 5). The risk of hemorrhaging, according to Dr. Dragovic, "is one of the most

12

important aspects of it". (Id). Further, because the decedent's fracture was open, comminuted and broken mid-shaft (distal), it presented even a greater risk of vascular injury and blood loss. (Id, p. 55).

Defendant's claim that it was not aware of an emergency medical condition is patently false. Defendant's undisputed diagnosis of the decedent's severe, life-threatening open fracture establishes its clear, actual knowledge of the decedent's emergency medical condition. This condition unquestionably met the definition under 42 U.S.C. § 1395dd(e)(1)(A).

Defendant's actual knowledge of the decedent's fracture alone triggered its duty to stabilize his emergency medical condition. Yet, substantial evidence raises a genuine issue of material fact that Defendant had actual knowledge, at the time of transfer, that the decedent was going into hemorrhagic shock. The fact that Defendant did not actually write down severe blood loss or hemorrhagic/hypovolemic shock as a diagnosis does not alter the fact the decedent manifested "acute symptoms so the hospital would know of the condition". Urban, 43 F.3d at 526.

To begin with, it is general textbook medical knowledge that any patient with a femur fracture will internally lose from 1 ½ to 2 liters of blood. (Bitterman dep, pp. 88, 182 - Exhibit # 2; Schell dep, p. 121 - Exhibit # 1). By Dr. Dragovic's (Defendant's expert) admission, the decedent's fracture presented a greater risk of vascular damage and hemorrhaging. (Dragovic dep, p. 55, 59 - Exhibit # 5). The decedent's size, increased fatty tissue and constant movements only exacerbated his blood loss. (Bitterman dep, pp. 88-89 - Exhibit # 2; Demeo dep, pp. 45-46 - Exhibit # 3). Indeed, Dr. Aranosian, another defense expert, admits that, by 3:30 a.m., the decedent had between 1500 and 3000 ccs of blood in his thigh - as much as 25% of his total volume. (Aranosian dep, p. 62 - Exhibit # 6).

13

Coupled with this medically unavoidable internal bleeding was the decedent's substantial,

external blood loss at 3:45 a.m.  Defendant's chart clearly reflects that, as the decedent continued

to move about, a "large amount" of "spurting" blood erupted from a leg wound.  (Defendant's

Exhibit # 2, p. 8; Phelps dep, p. 45 - Exhibit # 7).  Though Dr. Schell self-servingly tries to minimize

the decedent's external blood loss at 3:45 a.m., Nurse Phelps specifically testified that the decedent

lost 300 ccs of blood.  (Id, pp. 45-46).

Moreover, Defendant's chart reflects virtually every classic sign of severe blood loss -

hemorrhagic shock.  These were:

I.      Increased, tachychonrdic heart rate;

II.     Erratic, labored respiration;

III.    No urine output - despite over 300 ccs of saline in a wide open IV;

IV.     Constant restlessness and agitation;

V.      Cooling , pale extremities with reduced radial pulse; and

VI.     A substantially dropping blood pressure.

(Schell dep, pp. 72, 74, 102, 118, 159 - Exhibit # 1; Bitterman dep, pp. 86, 91-92, 167 -
Exhibit # 2; Aranosian dep, pp. 71, 76, 83 - Exhibit # 6).  (See also Exhibit # 16 - Tintinallis
Emergency Medicine, 4th Ed, 1996, p. 198).

Dr. Schell testifies that, if accurate, the decedent's vital signs "would reflect a hypotensive

patient" for which a doctor would consider blood loss and hypovolemia. (Schell dep, p. 72-74 -

Exhibit # 1).  While admitting that the decedent may have lost blood, Schell nonetheless claims that,

due to the decedent's size and constant movements, the charted blood pressure readings were not

accurate and did not show hypovolemia.

Nurse Phelps and Dr. Loniewski's testimony, which Defendant avoids, conclusively rebuts

Dr. Schell's attempt to disregard the charted blood pressure readings.  Ms. Phelps is clear that none

14

of the charted blood pressure readings were inaccurate. (Phelps dep, p. 39 - Exhibit # 8; see also Loniewski dep, pp. 89, 90, 113, 116, 120 - Exhibit # 9). She definitively testifies that "I would not have allowed it to be on the record if I thought it was inaccurate, because I was monitoring his vital signs". (Id). Nurse Phelps' testimony establishes the veracity of Defendant's graphic charting of the decedent's plummeting vital signs. These valid "acute symptoms" establish Defendant's actual knowledge of the decedent's severe blood loss and hemorrhagic shock.

To make matter worse for Defendant, its own expert, Dr. Dragovic, unequivocally testifies that from 4:10 a.m. forward, the decedent became hypotensive. (Dragovic dep, pp. 29-30 - Exhibit # 5). This was well over an hour before Defendant transferred the decedent. In Dragovic's own words, the "readings are hypotensive". (Id, p. 25). Dr. Dragovic is crystal clear that the primary cause of the decedent's hypotension was blood loss. (Id, pp. 27, 30). Defendant's own expert establishes that Defendant had actual knowledge of the decedent' severe blood loss starting at 4:10 a.m.

If all this evidence is not enough, the appalling scene depicted by Paramedic Ellison unequivocally shows that Defendant had actual knowledge that the decedent was bleeding to death. Ellison found two gushing wounds; could not control the decedent's bleeding; applied dressings, then towels soaked with the decedent's blood; observed the decedent's labored breathing and that Defendant's nurses could not get a blood pressure. All this occurred either in the presence of Dr. Schell or with his actual notice. Ellison's testimony, corroborated by the decedent's aunt and sister, conclusively proves Defendant knew the decedent was bleeding to death.

It is well established that charted symptoms and vital signs may establish a hospital's knowledge of an emergency medical condition. Burditt v. U.S. Dept. of Health and Human Services, 934 F.2d 1362, 1368 (5th Cir. 1991) (charted blood pressure readings provided "substantial" evidence

15

that the plaintiff entered and exited the hospital with an emergency medical condition); <u>Griffith v.</u>
<u>Mt. Carmel Medical Center</u>, 831 F.Supp. 1532, 1544 (D. Kan. 1993) (emergency room records
rebutting doctor's testimony that plaintiff had a "non-emergent" condition "raise a question of fact
as to whether or not (Defendant's) personnel actually determined that (plaintiff) had an 'emergency
medial condition'"); <u>Brodersen v. Sioux Valley Memorial Hospital</u>, 902 F.Supp. 931, 944 (N.D.
Iowa 1995) (despite hospital employees' testimony, emergency room records and expert affidavit
raise fact question whether defendant's personnel actually determined that plaintiff had an
emergency medical condition). In conjunction with the diagnosed femur fracture, evidence raises
a genuine issue of material fact that, prior to transfer, Defendant had actual notice that the decedent
was going into hemorrhagic shock.

Defendant accordingly owed a duty under EMTALA to stabilize the decedent's condition.
Substantial evidence proves that Defendant violated that duty.

## II. AMPLE EVIDENCE RAISES A MATERIAL FACT QUESTION THAT DEFENDANT TRANSFERRED THE DECEDENT WITHOUT STABILIZING HIS EMERGENCY MEDICAL CONDITION.

Defendant incorrectly argues that, as a matter of law, it stabilized the decedent's emergency
medical condition. A hospital stabilizes an emergency medical condition under EMTALA when it
provides "such medical treatment of the condition as may be necessary to assure, within reasonable
medical probability, that no material determination of the condition is likely to result from or occur
during the transfer of the individual from a facility". 42 U.S.C. § 1395dd(e)(3)(A). Substantial
evidence demonstrates that Defendant did not stabilize the decedent before transfer.

Defendant's contention that it stabilized the decedent's condition is based on three premises:

1.    Defendant provided proper "traction and immobilized the femur". (Defendant's
      brief, pp. 1-2, 15-16).

16

2.     Defendant controlled the decedent's bleeding; his dressing was "dry and intact; the decedent was not bleeding at time of transfer and Defendant was unaware of any significant blood loss. (Id, pp. 5-6).

3.     The decedent's blood loss was undiagnosed and "irrelevant for the purpose of establishing EMTALA liability". (Id, p. 16).

None of Defendant's positions are correct.

Both Defendant's chart and Amy Ellison's testimony conclusively rebut Defendant's claim that it properly immobilized the decedent's fracture. Defendant's chart repeatedly indicates that the decedent was "very restless" and "thrashing about". (Defendant's Exhibit # 2, pp. 7, 9). Defendant's characterization that the decedent was "uncooperative" tries to avoid the fact that restlessness is a key symptom of hypovolemia. The decedent's charted, constant movements directly contradict Defendant's claim that it immobilized the decedent's fracture.

Even more, Paramedic Ellison specifically testifies that the decedent's femur, instead of being "immobilized," was "snapping and popping around" and "grinding". (Ellison dep II, pp. 62, 82 - Exhibit # 11). All the while, the decedent's movements of his mid-shaft fracture exacerbated vascular damage. (see above). Compelling evidence proves that Defendant did not immobilize and stabilize the decedent's femur fracture.

Defendant's claim that it controlled the decedent's bleeding is also spurious. As demonstrated above, Defendant's chart, along with the testimony of Nurse Phelps, Paramedic Ellison, Thelma Pittman, Andrea Smith, Dr. Bitterman, Dr. Dragovic and Dr. Aranosian, establish that, before transfer, the decedent lost approximately 3800 ccs of blood. (3000 cc internally, another 800 ccs externally). This does not include the blood lost at the scene of the accident. After hearing testimony about inadequate dressings, a bloody sheet and two blood-soaked towels, any reasonable

17

jury will reject Defendant's incredulous claim that the decedent was not bleeding at the time of transfer.

With the decedent's grave vital signs, copious bleeding and non-immobilized fracture, Paramedic Ellison testifies that Mr. Smith was not stable for transport. (Ellison dep I, pp. 72-73, 75, 83-84, 86 - Exhibit # 10). Plaintiff's experts, Dr. Bitterman and Dr. Demco, fully concur that Defendant failed to stabilize the decedent before transfer. (Bitterman dep, pp. 132-133, 147, 169-172; 217-222 - Exhibit # 2; Demco dep, pp. 63, 91-92 - Exhibit # 3). They indicate that proper immobilization of the fracture, control of the decedent's bleeding and a blood transfusion would not only have stabilized his condition, but saved his life. (Bitterman dep, pp. 96-98, 134, 136-137, 187, 205, 219-220, 222 - Exhibit # 2; Demco dep, pp. 73, 90-92 - Exhibit # 3). Plaintiff presents a notably meritorious EMTALA claim.

Finally, Defendant's attempt to disavow liability for the decedent's blood loss is devoid of merit. Aside from the fact Defendant clearly knew the decedent was bleeding to death, as demonstrated, a severe open femur fracture is an emergency medical condition because of the life-threatening risk of blood loss. The decedent's listed cause of death was "Hemorrhage from leg fractures". (Defendant's Exhibit # 5, p. 1). Defendant's own expert, Dr. Dragovic, concurs that the decedent died of blood loss as a direct complication of the leg fracture. (Dragovic dep, p. 42 - Exhibit # 5). The decedent clearly died because Defendant failed to stabilize the emergency medical condition it admittedly diagnosed.

The case at bar bears no relation to the cases Defendant relies on. Space constraints prevent Plaintiff from reviewing each case cited by Defendant individually. In general, however, in each of Defendant's cited cases, unlike the case at bar, the Defendant either did not have actual knowledge of an emergency medical condition or properly stabilized the Plaintiff. Plaintiff presents a genuine

18

issue of material fact that Defendant violated EMTALA by transferring the decedent while unstable.

Defendant's motion for summary judgment should be denied.

### III.   DEFENDANT DID NOT SATISFY EITHER THE WRITTEN CONSENT OR WRITTEN TRANSFER CERTIFICATION EXCEPTIONS PERMITTING TRANSFER OF AN UNSTABLE PATIENT.

Neither of Defendant's final, parenthetical arguments are meritorious. Defendant's claim that it obtained consent for the decedent's transfer under EMTALA is incorrect. Defendant's argument is based on the false premise that the decedent was "stable". As shown, the decedent clearly was not stable.

EMTALA permits a hospital to transfer an unstable patient only if the patient, "after being informed of the hospital's obligations under this section and the risk of transfer, <u>in writing requests transfer to another medical facility</u>". 42 U.S.C. § 1395dd(c)(1)(A)(i) (emphasis added). It is uncontested that the decedent never requested transfer "in writing". Defendant presents no authority supporting adequacy of an alleged oral "consent".

Even more, this transfer request rule applies only when a patient requests transfer knowing that he is unstable and after being informed of the hospital's "obligations" to stabilize him. <u>Id</u>. Defendant has consistently maintained that (1) it (and not the decedent) decided to transfer and (2) the decedent remained stable. 42 U.S.C. §1395dd(c)(1) does not apply in this context. Additionally, Defendant does not claim the decedent "requested" transfer, but only "consented" to Dr. Schell's decision. For this reason as well, the rule does not apply.

Further, the decedent's aunt confirms that Defendant decided to transfer her nephew without any family option. (Perryman dep, pp. 48, 49 - Exhibit # 12). Defendant's "consent" argument is totally misplaced.

19

Finally, Defendant's argument that it complied with the transfer certification requirement under 42 U.S.C. § 1395dd(c)(1)(A)(ii) is devoid of merit. Defendant admits that it did not prepare any written certification under EMTALA. Defendant's claim of substantial compliance, citing Vargas v. DelPuerto Hosp., 98 F.3d 1202 (9th Cir. 1996), is mistaken. In Vargas, the doctor completed a proper EMTALA written certification, but omitted one portion. Id at 1204. Defendant's failure to prepare any written certification (no compliance) is not analogous to the substantially completed document in Vargas.

Defendant presents no grounds warranting summary judgment. Plaintiff raises a meritorious EMTALA claim. Defendant's motion should be denied.

Respectfully submitted,

MARC LIPTON (P45877)
Attorney for Plaintiff
18930 W. 10 Mile Rd. #3000
Southfield, MI 48075
(248) 557-1688

Dated: January 4, 2002

20

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT, SOUTHERN DIVISION
### OF MICHIGAN

WILLIE SMITH,
Personal Representative of the
Estate of Kelly Snider Smith, Deceased,

        Plaintiff,

v

                          Case No: 00-71459
                          HON: Avern Cohn
                          Magistrate Judge Goldman

BOTSFORD GENERAL HOSPITAL, a Michigan
Non-Profit Corporation,

        Defendant.

_____/

| | |
|---|---|
| MARC LIPTON (P43877) | LINDA M. GALBRAITH (P30781) |
| JODY LIPTON (P49001) | JEFF FEIKENS (P42816) |
| LIPTON LAW CENTER, P.C. | Attorneys for Defendant |
| 18930 W. 10 Mile Rd. #3000 | 700 First National Bldg. |
| Southfield, MI 48075 | 660 Woodward Ave. #700 |
| (248) 557-1688 | Detroit, MI 48226-3516 |
| | (313) 962-5909 |

_____/

## PROOF OF SERVICE

The undersigned certifies that a copy of:

▸   *Plaintiff's Answer to Defendant's Motion for Summary Judgment, Brief in Opposition to Defendant's Motion for Summary Judgment; Questions Presented, Controlling Authority;*
▸   *Proof of Service.*

Was served by first class mail, postage fully prepaid, to: **LINDA GALBRAITH and JEFF FEIKENS, 700 First National Bldg., 660 Woodward Ave., #700, Detroit, MI 48226-3516** on January 4, 2002.

    I declare that the statements above are true to the best of my knowledge.

Kerry Youngblood

## EXHIBIT INDEX

| Exhibit | Number |
|---|---|
| Deposition transcript of Frank Schell, D.O. | 1 |
| Deposition transcript of Robert Bitterman, M.D. | 2 |
| Deposition transcript of Dr. Daniel Demco | 3 |
| Deposition transcript of Arya Moti, D.O. | 4 |
| Deposition transcript of L.J. Dragovic, M.D. | 5 |
| Deposition transcript of Robert Aranosian, D.O. | 6 |
| Deposition transcript of Barbara Phelps | 7 |
| Deposition transcript of Steven Kronick, M.D. | 8 |
| Deposition transcript of Catherine Loniewski, D.O. | 9 |
| Deposition transcript I of Amy Ellison | 10 |
| Deposition transcript II of Amy Ellison | 11 |
| Deposition transcript of Thelma Perryman | 12 |
| Deposition transcript of Andrea Smith | 13 |
| Deposition transcript of Werner Spitz, M.D. | 14 |
| Oakland County EMS Medical Report | 15 |
| Tintinallis Emergency Medicine, 4th Ed, 1996, p. 198 | 16 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED