

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREA SMITH, ETC.,

      Plaintiff,

   v.

BOTSFORD GENERAL HOSPITAL,
ETC.,

      Defendant.

_____/

HONORABLE AVERN COHN

No. 00-71459



**JURY TRIAL - VOLUME V - EXCERPT**

**Monday, April 14, 2003**

-   -   -

Appearances:

Geoffrey N. Fieger
Fieger, Fieger & Kenney
19390 West Ten Mile Road
Southfield, Michigan  48075
(248) 355-5555

Marc Lipton
Lipton Law Center, P.C.
18930 West Ten Mile Road
Southfield, Michigan  48075
(248) 557-1688
Attorneys for Plaintiff

Linda M. Galbraith
Jon Feikens
Feikens, Stevens, Kennedy
660 Woodward Avenue, #700
Detroit, Michigan  48226
(313) 962-5909
Attorneys for Defendant

-   -   -

*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313) 965-4401*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

*Jury Trial*
*Mon., 4-14-03/Vol. V/Excerpt*

## I N D E X

Plaintiff's Case in Chief                                    Page   Vol.

**James Sapala, M.D.**

    Direct Examination By Mr. Fieger:              3      1

Certification of Reporter                             36

-   -   -

*Jury Trial*
*Mon., 4-14-03/Vol. V/Excerpt*                     3

1                                    Detroit, Michigan

2                                    Monday, April 14, 2003

3                              -    -    -

4        (Beginning of excerpt.)

5                              -    -    -

6                        **JAMES SAPALA, M.D.,**

7            being first duly sworn by the Court to tell

8            the truth, was examined and testified upon his

9            oath as follows:

10              **THE COURT:**  Take that seat.

11                  Go ahead.

12              **MR. FIEGER:**  Thank you, Your Honor.

13              **THE COURT:**  Move the lectern over to the center.

14              **MR. FIEGER:**  Yes, sir.  Is that okay, Your Honor?

15                  Good morning, ladies and gentlemen.

16              **THE JURORS:**  Good morning.

17                              -    -    -

18                        **DIRECT EXAMINATION**

19      BY MR. FIEGER:

20      Q.   Dr. Sapala, could you please state your name for the

21      Court and jury, please?

22      A.   Yes.  James Andrew Sapala.

23      Q.   And, Dr. Sapala, do you practice a profession?

24      A.   Yes, I do.

25      Q.   What is that profession, sir?

---

*Andrea Smith, etc. v. Botsford General Hospital, etc.*

1    A.    Bariatric surgery.

2    Q.    And is that surgery a part of another specialty within

3    medicine?  Is that a subspecialty of another specialty

4    within medicine?

5    A.    Yes, it is.

6    Q.    What is that a subspecialty of?

7    A.    General surgery.

8    Q.    All right.  How long have you been practicing the

9    profession of general surgery?

10    A.    25, 30 years.

11    Q.    And where do you practice, sir?

12    A.    In the City of Detroit.

13    Q.    Where?

14    A.    At St. John Detroit Riverview Hospital and the DMC,

15    Detroit Medical Center.

16    Q.    Do you practice only within hospitals or do you have a

17    private practice and place your patients in the hospital for

18    surgery?

19    A.    I have a private practice and place my patients in the

20    hospital for surgery.

21    Q.    What is your practice known as, if you could tell us?

22    A.    It is known as the Cory Centers for Obesity-Related

23    Illnesses.

24    Q.    Where do you maintain offices, sir?

25    A.    I have an office in Jackson, Michigan, and an office in

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                           5

1    Warren, Michigan.

2    **Q.**   I apologize, Doctor.  Presently where are you on staff,

3    at which hospitals?  I know you said.

4    **A.**   At the Detroit Medical Center and St. John Detroit

5    Riverview.

6    **Q.**   In the past have you also maintained privileges at

7    other area hospitals?

8    **A.**   Yes, I have at St. John Oakland Hospital.

9    **Q.**   Very good.

10          Doctor, were you the treating physician of

11   Kelly Snyder Smith?

12   **A.**   Yes, I was.

13   **Q.**   When I say treating -- I said treating physician, but

14   would you describe to the Court and the jury the

15   circumstances under which you became the treating physician

16   for --

17          **THE COURT:**  I don't think he ever defined

18   bariatric.

19          **MR. FIEGER:**  I would be glad to do that, too.  I

20   was going to do that.

21   **BY MR. FIEGER:**

22   **Q.**   Tell the Court and jury, please, what it means to be a

23   bariatric surgeon as a subspecialty of general surgery?

24   **A.**   A bariatric surgeon is a surgeon who operates on

25   patients who suffer from a condition known as morbid

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                        6

1   obesity, and morbid obesity is defined as being 100 pounds

2   over one's ideal body weight, and as a consequence of being

3   overweight developing a medical condition or what is

4   so-called comorbidity that could be potentially life

5   threatening.  For example, high blood pressure, diabetes,

6   degenerative joint disease, chronic difficulties breathing,

7   a whole host of medical illnesses related to the weight

8   gain.  The surgical treatment for morbid obesity is

9   bariatric surgery.  So rather than treating them with pills

10  or with exercise or a specific diet regimens -- we use those

11  modalities, but then we intervene with surgery to get the

12  weight down.

13  **Q.**   How long have you been practicing the subspecialty of

14  bariatric surgery?

15  **A.**   Purely bariatric surgery since 1990.

16  **Q.**   As a general surgeon you trained, and did you treat

17  fractured femurs as part of your training in the period

18  prior to the time you did exclusively bariatric surgery,

19  sir?

20  **A.**   Yes, I did.  I did especially during my training at

21  Henry Ford Hospital where I rotated through orthopedics and

22  the trauma service.

23  **Q.**   Prior to I believe it was this past Saturday, had you

24  and I ever spoken?

25  **A.**   We had not.

1 **Q.**   Now, in all candor you are aware that -- you became

2 aware that I know your brother, the chief judge of the Wayne

3 County Circuit Court, but I do not know you, do I?

4 **A.**   That is correct.

5        **THE COURT:**  The former chief judge of the Wayne

6 County Circuit Court

7        **MR. FIEGER:**  Correct.

8 **BY MR. FIEGER:**

9 **Q.**   He is now the former chief judge of the Wayne County

10 Circuit Court?

11 **A.**   Correct.

12 **Q.**   Before that you and I had never spoken before?

13 **A.**   No, we had not.

14        **THE COURT:**  I was going to ask you if Mike was

15 your brother.  He's a good judge.

16 **BY MR. FIEGER:**

17 **Q.**   Before I ask you about your treatment of Kelly Smith,

18 what records have you reviewed in order to give testimony

19 today in court concerning your opinions and conclusions

20 regarding this case?

21 **A.**   I have reviewed the emergency room records at Botsford

22 General Hospital, the Oakland County EMS transfer records,

23 the University of Michigan records, several depositions

24 including Dr. Schell, Dr. Loniewski, a Barbara Phelps, a

25 number of -- maybe six or eight depositions, as well as the

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*

8

1    autopsy report from the University of Michigan.

2    **Q.**   Do you have opinions relative to this case as to

3    whether your patient was appropriately stabilized prior to

4    the transfer out of Botsford Hospital?

5    **A.**   I do have an opinion.

6    **Q.**   Could you tell me how it came about that you were --

7    that you agreed to or agreed to give testimony in this case?

8         **MS. GALBRAITH:**  I'm going to object to the

9    question, Your Honor.

10        **THE COURT:**  Objection sustained.

11        **MS. GALBRAITH:**  Thank you.

12   BY MR. FIEGER:

13   **Q.**   Were you just retained out of the blue to act as an

14   expert in this case?

15   **A.**   I was contacted by Mr. Marc Lipton, and he asked me to

16   review this particular case from the perspective of the

17   treating physician.

18   **Q.**   Okay.  At some point did your review then go beyond

19   that in terms of what your opinions are?  In other words,

20   did you confine your opinions only to that within the

21   treatment that you rendered to Kelly?

22   **A.**   I did originally, but after reviewing the records given

23   to me I was, I was essentially amazed --

24        **THE COURT:**  No, wait.  No, I don't understand that

25   question, Mr. Fieger.  Hold on a minute.

*Andrea Smith, etc. v. Botsford General Hospital, etc.*

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                                    9

1          **MR. FIEGER:**  His testimony here is not, did not

2     arise out of the circumstances as counsel often --

3          **THE COURT:**  No, just -- go to your next question

4     or repeat the question, then I'll see what --

5     **BY MR. FIEGER:**

6     **Q.**   In terms of your review of the -- let me ask you it

7     this way.  The circumstances relating to Kelly Snyder

8     Smith's death, did you come to opinions and conclusions

9     based upon your knowledge of his health and your prior

10    treatment of him that you felt were important to be told to

11    I guess Mr. Lipton?

12    **A.**   Yes.

13    **Q.**   You have described to us -- let's, let's talk about

14    something.  In order to -- how did Kelly Smith come to you

15    to be treated by you?

16    **A.**   I believe he had either a friend or a distant relative

17    who worked in the Infectious Disease Records Department at

18    St. John Detroit Riverview Hospital, and he was referred

19    because he was morbidly obese by that individual.

20    **Q.**   By the way, you have reviewed the death certificate in

21    this case, am I correct?

22    **A.**   I have.

23    **Q.**   The death certificate and other documents make

24    reference to two co-morbidities, and you talked about

25    morbidities.  Can you have a morbidity while you're live?

*Andrea Smith, etc. v. Botsford General Hospital, etc.*

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                          10

1    **A.**   Yes.

2    **Q.**   Explain that to the Court and jury.

3    **A.**   As an example, many of our patients have type

4    II diabetes.  After gaining a lot of weight --

5          **THE COURT:**  Well, wait.  Define the word morbidity

6    for us so we'll understand.

7          **THE WITNESS:**  Morbidity is a medical condition

8    that develops as a result of weight gain, and a typical

9    example in the morbidly obese patient is the individual who

10   develops type II diabetes or so-called adult onset diabetes

11   and what happens is a patient's weight increases and the

12   requirements for insulin increase and the patient cannot

13   make enough insulin so that individual ends up taking

14   insulin injections, and it's the high insulin level that

15   leads to problems with the eyes, problems with the kidneys,

16   losing one's toes, needing amputations.  There are a whole

17   host of problems that develop because of hyperinsulinism,

18   and it goes back to the original weight gain.

19               Another example would be high blood pressure.

20   A number of our patients have high blood pressure that have

21   to be treated with medicine.  That can result in an enlarged

22   heart, strokes or heart attack depending upon the severity.

23   **Q.**   Now, in this particular case the death certificate and

24   other records list morbid obesity as a condition.  You have

25   reviewed all of the records, have you not?

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                    11

1    A.    I have.

2    Q.    Did Mr. -- in this particular case did your patient

3    Kelly Smith die as a result of morbid obesity?

4    A.    He did.

5    Q.    I'm sorry?

6    A.    Well, he died -- he had risk factors for dying from

7    morbid obesity.

8    Q.    But in this case did he die of it, of morbid obesity?

9    A.    He did not die of morbid obesity.

10          **MS. GALBRAITH:**  Excuse me.  I'm sorry, the witness

11   already answered the question.  He just repeated it again so

12   it was asked and answered.

13          **THE COURT:**  No, no, no, no, no.  There's been

14   a lot of asked and answered.  If I sustained -- everyone

15   objected every time that the question was repeated, both of

16   you would be standing on your feet consistently.

17                Go ahead.

18   BY MR. FIEGER:

19   Q.    If he didn't die of morbid obesity, what did he die of?

20   A.    He died of hemorrhagic -- hypovolemia, hemorrhagic

21   shock.

22   Q.    Now, there's also another condition listed along with

23   morbid obesity.  It's dilated cardiomyopathy.  Just in

24   laymen's terms, what does that mean, Doctor?

25   A.    A dilated cardiomyopathy is an enlarged heart that is

*Andrea Smith, etc. v. Botsford General Hospital, etc.*

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                                    12

1    in the process of losing its pumping action.

2    Q.   Did he in this case die of an enlarged heart?

3    A.   No.

4    Q.   Did he have -- when you were treating him during life,

5    did he have those two conditions?

6    A.   I would assume that he did because he had scarring from

7    a cardiomyopathy that was reported on the autopsy report.

8    Q.   Did he have morbid obesity?

9    A.   He had morbid obesity.

10   Q.   Okay.  What is an enlarged heart due to in this case?

11   A.   It's due to not being able to pump the blood that

12   returns to the heart out into the tissues because the

13   pressures are very, very high, and this is related to the

14   patient's size.  The patient was 500 pounds.

15   Q.   Is there a direct relationship between the obesity and

16   the enlarged heart?

17   A.   There is.  In fact, it's very unusual to find a patient

18   who weighs 500 pounds who doesn't have an enlarged heart or

19   a cardiomyopathy.

20   Q.   By the way, in terms of -- we have heard about

21   stressing the heart.  In terms of -- did you ever operate on

22   Kelly Smith?

23   A.   Yes, I did.

24   Q.   What operations did you do on Kelly?

25   A.   I performed an operation called a Roux-en-Y gastric

1    bypass.

2    **Q.**   And could you tell -- by the way, I think we probably

3    should go back at this point.  Prior to doing the surgery on

4    Kelly obviously did you meet him?

5    **A.**   Yes.

6    **Q.**   Could you describe to us your impression of him as a

7    physician?

8    **A.**   I remember Mr. Smith as being an obviously morbidly

9    obese African American male patient who presented with a

10   very significant comorbidity.  A comorbidity which he

11   complained of which was most disabling to him was having a

12   tracheostomy or a condition related to his weight called

13   sleep apnea.  In patients who have sleep apnea there is so

14   much fatty connective tissue in the back of the throat that

15   patients cannot exchange air so when they lie back to sleep

16   at night the tongue closes off the airway and they can

17   actually stop breathing.  The term that we use is

18   asphyxiation.

19            So in 1997 Mr. Smith went to Beaumont Hospital and

20   had a hole put in his throat, a so-called tracheostomy, so

21   that the air wouldn't have to go down the nose and the

22   mouth, it could bypass the clogged area where all of this

23   fatty tissue was, and it would go directly to the lungs and

24   the throat.  This was called a tracheostomy.

25            He was a relatively young person, 33 years of age,

1    and it was his intent to ultimately get rid of the hole in

2    his throat.  I remember him as being an energetic, vivacious

3    patient who appeared to be motivated and was looking forward

4    to correcting his weight so that his co-morbidities could be

5    improved.

6    Q.   In what sense, beyond the sleep apnea, in what sense

7    does self-image have any motivating factor or any input

8    whatsoever from a psychological perspective in terms of

9    treating a patient such as Kelly?

10   A.   Many of our patients are very stressed, very

11   despondent.  Many of our folks have been heavy since a very

12   early age.  It is in many individuals a genetic component.

13   Patients are shunned.  We do know that many of our patients

14   will go from one doctor to the next because up until

15   recently the medical profession has not looked upon morbid

16   obesity as a distinct disease.  It's only been since

17   Carney Wilson and Rosanne Barr and Al Roker have gotten the

18   Roux-en-Y procedure that most patients don't even know that

19   there is an operative intervention that can be successful.

20           So our patients are frequently very depressed,

21   have very low self-esteem.  This is a last resort so they

22   come to us to save their lives or to give them their lives

23   back.

24   Q.   As part and parcel of your treatment do you have

25   psychological profiles and histories done of the patients?

1  A.   Yes, we do.  Our protocol requires that every patient

2  have a psychological profile consisting of an MMPI, which is

3  a specific test, as well as an interview with either a

4  psychiatrist or a licensed psychologist.

5  Q.   And in that test are, for instance, they evaluated for

6  rhe possibility of alcohol or drug abuse?

7  A.   That is correct.

8  Q.   Did Kelly have such a test?

9  A.   He did.

10  Q.   In terms of the MMPI, did you refer him to a

11  psychologist to have him evaluated for possible surgery?

12  A.   I did.

13  Q.   What was your understanding of whether he had any

14  history whatsoever of alcohol abuse or cocaine abuse?

15  A.   I was unable to elicit a history of alcohol or cocaine

16  abuse, and the psychologist also was unable to get a history

17  of drug abuse.

18  Q.   What do you mean he was unable?

19  A.   Upon questioning, the patient denied that there was any

20  history.

21  Q.   Now, by the way, in terms of the MMPI, do they also

22  rate patients for the possibility that patients are not

23  telling the truth on various things including past social

24  history with alcohol and drugs or a number of other things?

25  A.   Yes.

1    Q.   And what was Kelly's evaluation in terms of his

2    truthfulness during the test as part of the MMPI?

3    A.   That he appeared to be truthful and the history

4    reflected his behavior.

5    Q.   As his treating physician, did you have any indication

6    whatsoever in terms of surgeries and the treatment that you

7    performed on him that he was in any way, shape or form a

8    drug abuser?

9    A.   I did not.

10   Q.   By the way, you have read these records.  If someone

11   should suggest, like a Dr. Dragovic --

12        MR. FEIKENS:  Objection.

13        THE COURT:  Wait a minute, wait a minute.  Start

14   your question over again.  Forget the personality.

15   BY MR. FIEGER:

16   Q.   Okay.  If somebody should suggest that your patient's

17   enlarged heart was due to drug abuse rather than the

18   obesity, what's your response to that?

19   A.   I --

20        THE COURT:  Wait a minute.  Go ahead.

21        MS. GALBRAITH:  Thank you.  I'm objecting to the

22   question.

23        THE COURT:  Why?

24        MS. GALBRAITH:  Because I feel that the

25   question --

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                                    17

1          **THE COURT:**  Based on the record made thus far and

2     the questions you have asked, the objection is overruled.

3          **MS. GALBRAITH:**  Thank you.

4     BY MR. FIEGER:

5     **Q.**   Go ahead, Doctor.

6     **A.**   It's been my experience treating bariatric patients

7     since the 1970's that if a 500-pound patient has

8     cardiomegaly in the absence of drug history I would look

9     upon the obesity as being the reason for the cardiomegaly.

10    **Q.**   By the way, there is also some reference in the autopsy

11    to interstitial fibrosis.  What is that?

12    **A.**   That's a scarring from the cardiomyopathy, which is a

13    result of the obesity.

14    **Q.**   Okay.  Have you seen any evidence in terms of your

15    review of this case that would change your mind concerning

16    your patient's heart and the cause of his enlarged heart?

17    **A.**   I have not.

18    **Q.**   Could you describe to us, Doctor, the surgeries that

19    you -- well, strike that.

20          In terms of the surgeries actually performed,

21    would those be what I guess would be called stressors on the

22    heart, in other words, would they be good predictors of the

23    relative strength of Kelly's heart and how damaged or

24    diseased it was in your opinion?

25    **A.**   Yes, it would.

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                                          18

1    **Q.**    Describe, please, that to the Court and jury.

2    **A.**    The operation that we do, it's called a Roux-en-Y

3    procedure, and roux is r-o-u-x.  It's a French word that

4    means route.  It's the same operation that Rosanne Barr had

5    and Carney Wilson and Al Roker.

6              **THE COURT:**  Who is that third person?

7              **THE WITNESS:**  Al Roker, the weather man.  He's on

8    TV on the morning show.

9              **MR. FIEGER:**  The Today Show, I believe.  He's the

10   weather man for The Today Show.

11             **THE COURT:**  Okay.  I don't watch that show.

12             **THE WITNESS:**  In the Roux-en-Y procedure what we

13   do is we divide the stomach into two parts, a very small

14   upper part about the size of a grape and continue the

15   intestine from the bottom of the stomach.  Then into the top

16   part of the stomach, which is about the size of a grape, we

17   bring up the little intestine and attach it to that.  So

18   food will come down the esophagus, it will go into that

19   little tiny pouch, then go into the little intestine,

20   bypassing the stomach and two or three feet of small

21   intestine.

22             The results are very, very good because with

23   a small pouch patients can't eat a lot, and with the bypass

24   component many of the calories folks eat cannot be absorbed.

25   There is a malabsorption component.  Also with the gastric

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*

19

1    bypass patients cannot tolerate sugar.  If they eat sugar,

2    such as pop or candy or ice cream, the majority of them get

3    sick so they have to change what they eat.

4                     So it is the Roux-en-Y procedure that

5    combines the control of the volume, the control of the sugar

6    and the control of calories.  When we put all three

7    together, about 90 to 95 percent of our patients get to

8    within 25, 30 percent of their ideal weight in a period of

9    about two years.  That is the operation that was offered

10   Mr. Smith.

11   **Q.**   And did he have that operation?

12   **A.**   He did.

13   **Q.**   When did he have that?

14   **A.**   He was operated on in May of 1998.

15   **Q.**   That was approximately just, unfortunately, a little

16   less than five months before he died?

17   **A.**   Correct.

18   **Q.**   Assume -- what, explain -- assuming he had the

19   operation only five months before he died and you referenced

20   two years, did he even have a chance to have that operation

21   be successful in terms of losing the desired weight and

22   getting to this 90 to 95 percent within 20 percent of body

23   weight?

24   **A.**   What happened with Mr. Smith, unfortunately after his

25   Roux-en-Y procedure, which was technically very successful,

1    six days later he was involved in a situation where he

2    disrupted his wound.  I don't know if it was from a cough or

3    being bounced around in a motor vehicle, but it wasn't

4    really an accident, but he came into the emergency room with

5    his intestine coming through the wound.  This was six days

6    after his original procedure.  So we took him back to the

7    operating room and had to put him back to sleep, put the

8    intestine back, and then reconstruct his anterior abdominal

9    wall.

10        So within a period of about a week he had

11   back-to-back surgeries.  So he didn't have time to get a

12   really good result because it took quite a while to recover

13   from his second surgery.

14   Q.   Notwithstanding that, you mentioned two years.  He

15   would have only been just several months into this

16   procedure.  What would you have expected, if he was part of

17   the 90 to 95 percent, how would the next 18 months to

18   two years go for him?

19   A.   Well, again, this is a statistical analysis.  Not

20   everybody who has the Roux-en-Y procedure is successful, we

21   do have an occasional failure, but we don't try to make any

22   statements in terms of ultimate weight loss until we are

23   well beyond 18 months.  We have had some folks who have lost

24   no weight in the first year and lost all of their weight in

25   the second year, and conversely, we have had folks that lost

1   all of their weight in the first eight months and then

2   plateaued out and didn't lose any more at all.

3          So we usually reserve any prognostication, any

4   prediction on the success until at least 18 months after

5   surgery, and unfortunately in Mr. Smith's case we could only

6   follow him for five months.

7   Q.   Based on the fact that within five months Mr. Smith was

8   still within the range of 500 pounds, does that mean that he

9   would not have been successful?

10   A.   No, it does not.

11   Q.   Describe to us then how having to undergo those

12   two separate surgeries in your opinion gives you some

13   indication about the strength of his heart?

14   A.   The Roux-en-Y procedure that we use, unlike some of the

15   gastric bypasses that are done today, the one that we do

16   requires a big incision.  It's about 15 to 16 inches long.

17   The reason is we have to go in there and by hand sew that

18   little pouch to the intestine.  It can't be done using

19   laparoscopic instruments.

20          As a consequence, it's a major, major

21   intervention.  It's requires a general anesthetic, and in

22   this case we put in a Horatio filter, which is a filter to

23   prevent a blood clot from dislodging in the leg and getting

24   into a lung because we know a number of real heavy patients

25   can develop a blood clot after an operation.  It also

1  required the placement of IV's and special instruments that

2  we had to use.

3         So it's a big procedure.  It's not a minor

4  operation.  That coupled with the fact that we had to go

5  back six days later for another general anesthetic, more

6  IV's, another hospitalization, it put us in a good position

7  to test the integrity of the heart muscle.

8  **Q.**  And how did he do?

9  **A.**  He did very well.

10  **Q.**  And could you please tell the Court and jury what your

11  opinion would be as to the relative integrity of his heart

12  to withstand the two procedures such as you described?

13  **A.**  Even though we would expect that these folks have

14  cardiomegaly, and he did on the autopsy and he did have some

15  scarring, apparently he had enough cardiac or heart reserve

16  being at the age of 33 that he could go through these

17  two procedures really without flinching.

18  **Q.**  Now, I want you to assume that the record in this case

19  shows that he had a prior bout with what's called congestive

20  heart failure.  Did that mean that his heart was forever

21  going to be failing?

22  **A.**  Again, it's another warning sign.  It's a sign that the

23  heart is working and cannot pump the blood coming back to it

24  as quickly as it should so the fluid backs up into the lungs

25  and the patient can't breathe.  That and the sleep apnea

1   told us that he needed to get his weight down.  Those are

2   warning signs, and if we can get to our patients early

3   enough before they have a heart attack or before they go

4   into intractable congestive heart failure, then a lot of our

5   patients are salvageable.

6   Q.   Assuming that Kelly was one of the 90 to 95 percent at

7   age 33, would you expect him to have problems again if he

8   lost the weight?

9   A.   If he got to within 20 percent of ideal body weight,

10  it's been our experience that folks do very well.

11  Q.   By the way, if Kelly was lucky enough, I don't know if

12  it's luck, but part of the 90 to 95 percent success rate

13  that you indicate occurs with this surgery in terms of

14  losing weight, what would you expect his life expectancy to

15  be then assuming he loses the weight within 20 percent of

16  ideal body weight?

17  A.   If he lost weight, he would have an essentially normal

18  life.  We don't operate on them for obesity.  We operate on

19  them for their comorbidities that result from being obese.

20  Q.   In Kelly's case that was what?

21  A.   He had sleep apnea, congestive heart failure,

22  cardiomyopathy.  All of the potentially life-threatening

23  problems that down the line can get him into trouble.

24  Q.   Earlier you mentioned that it was your opinion that he

25  did not die of an enlarged heart or obesity.  You said

James Sapala, M.D. - Direct
Mon./4-14-03/Vol. V

24

1    hemorrhagic shock.  What in your opinion -- why do you say

2    that?  Why is it your opinion that Kelly died of hemorrhagic

3    shock?

4    A.   I think one has to go back to the, the automobile

5    accident, the transfer to Botsford Hospital, and I think you

6    have to start at that level and take a look at the clinical

7    continuum that took place from the time he was in the

8    emergency room at Botsford to the time that he had his

9    cardiopulmonary arrest in the ambulance.

10   Q.   What does that show you, Doctor?

11   A.   Well, it tells me that he was in a situation where the

12   circulating blood volume in his body was depleted over time.

13   Certainly when he arrived to Botsford he was in a "fairly

14   stable" situation, at least the record reflects that, but

15   then over a period of about three hours there was a

16   deterioration in his clinical condition that ultimately led

17   to the cardiopulmonary arrest.

18   Q.   Was he stable at the point that he was transferred from

19   Botsford Hospital?

20   A.   He was not.

21   Q.   Do the medical records and the records from the EMS

22   document that instability in your opinion?

23   A.   Yes, they did.

24   Q.   If we only look at -- I'd like to look at two records.

25   The last page of the nurse's note from Botsford Hospital,

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*

25

1    have you seen that?

2    **A.**    Yes, I have.

3    **Q.**    Documenting times of 4:30 and 5:05.  Would, assuming

4    the injury to his leg --

5              By the way, was he bleeding externally or

6    internally or both?

7    **A.**    Both.

8    **Q.**    A documented blood pressure at 4:30 -- excuse me, pulse

9    of 132, respirations 32, and blood pressure of 76 over 55,

10   in a man who suffered this injury after an hour and-a-half

11   in the hospital is this a sign of stability or instability?

12   **A.**    It's a sign of instability.

13   **Q.**    Why?

14   **A.**    The patient has decreased circulating blood volume.

15   First of all, he has a pulse rate that's 130, which is very

16   high, and that is consistent with a blood pressure that's

17   very low.  And what the body does to try to compensate for a

18   low blood pressure is to have the heart pump faster, and

19   this is consistent with not enough volume of blood in the

20   body to maintain profusion to vital organs.

21   **Q.**    5:05, a pulse of 133, respirations 32, blood pressure

22   is 71 over 38.  Is that indicative of stability or

23   instability in this person?

24   **A.**    Instability.

25   **Q.**    Why?

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*

26

1    **A.**    In spite of the fact that he was given fluids, I think

2    he was given some crystalloid, the other fluids I'm not

3    sure, but he had some crystalloid, if the volume depletion

4    were not significant, the fluid replacement could bring up

5    the blood pressure and slow the pulse, but here we have

6    two separate readings just before his transfer and

7    apparently whatever therapy was given to the patient didn't

8    make a difference in his vital signs.

9    **Q.**    By the way, I want you to assume that during this

10   period of time he was at Botsford Hospital for a period of

11   at least 2 hours and 45 minutes he had no urine output.  Is

12   that consistent with hemorrhagic shock?

13   **A.**    Yes, it is.

14   **Q.**    Explain to the Court and jury why.

15   **A.**    Well, that's very serious because what happens, what

16   the body does in order to maintain profusion to the

17   two vital organs, it draws blood from other areas, and the

18   two organs that need to be maintained for life are, number

19   one, the heart and, number two, the brain, and what the body

20   will do, it will shunt blood away from all of the other

21   organs.  His skin gets real cold because we don't need to

22   have a warm skin to live.  It will shunt blood from the

23   kidney because you really don't have to urinate to live, but

24   you've got to have blood to the brain.

25            So in this case all of that blood was being

---

*Andrea Smith, etc. v. Botsford General Hospital, etc.*

1    shunted to the vital organs, and it tells us that there

2    wasn't enough volume left to profuse the kidneys so the

3    kidneys stopped making urine.  It's all right for a while,

4    but if the kidneys are deprived for more than several hours,

5    then the kidneys go into what we call renal shutdown and

6    they stop functioning.

7    **Q.**    In the face of all of the symptoms that we discussed

8    just a moment ago and the complete lack of urine, is that

9    indicative of stability or instability, Doctor?

10   **A.**    Instability.

11   **Q.**    Doctor, do you have knowledge, because it's been talked

12   about here in this case, of Kelly's hemoglobin level?

13   **A.**    I do.

14   **Q.**    Tell the Court and jury what hemoglobin is within the

15   blood.  We all know that it's a test of the blood.

16   **A.**    Hemoglobin is reflective of how many red blood cells

17   you have in your blood stream, and red blood cells carry

18   oxygen.  If you have decreased red blood cell mass, then

19   your oxygen level goes down.

20          After the second operation that I performed on

21   Mr. Smith, his hemoglobin level after the second surgery was

22   14 grams.  This is a man who probably walked around with 15

23   or 16 grams of hemoglobin, which for him would be adequate.

24   **Q.**    Doctor, what would then be the significance if he had a

25   normal -- what did you say his normal was after an

1    operation?

2    **A.**   After his operation we know that his hemoglobin level

3    was 14.

4    **Q.**   What's the significance then if a half hour after he

5    came into the hospital he tests with a hemoglobin of 11.6?

6    **A.**   Well, that's almost a 20 percent decrease.

7    **Q.**   What does that mean, Doctor?

8    **A.**   It tells me that in the first half hour after the

9    automobile accident that he's had a significant blood loss.

10   **Q.**   Doctor, by the way, I want to skip just a little

11   forward, are you aware when he got to the U of M, and I want

12   you to assume that he coded in the ambulance, in essence his

13   pupils were fixed and dilated, but nevertheless at the U of

14   M they attempted some life-saving procedures and they took a

15   hemoglobin test.  What was his hemoglobin at the U of M, if

16   you know?

17   **A.**   I believe it was 9.6.

18   **Q.**   Okay.  Do you know when the hemoglobin was taken, sir?

19   **A.**   I think it was taken shortly after he arrived to the

20   University of Michigan ER.

21   **Q.**   I want you to assume that his hemoglobin was taken at

22   7:00 and that prior to his hemoglobin being taken the

23   University of Michigan Hospital gave him three units of

24   blood.  My first question is, what is a unit?

25   **A.**   A unit is what we call actually a pack cell.  That's

1   about a half a liter, and it consists mostly of red blood

2   cells plus some plasma.

3   Q.   Okay.  I want you to assume that they gave Kelly

4   three units of blood at 6:55, then tested his hemoglobin,

5   which was 9.6.  What conclusions can be drawn from that

6   scenario, sir, taking into account the 11.6 at 3:30, your

7   knowledge of what his normal hemoglobin is, and then the 9.6

8   after three units of blood?

9   A.   The three units of blood was not enough to keep up with

10  the blood loss.  If he originally had a hemoglobin level of

11  11.6 and things were stable, after three units of blood his

12  blood should be up to 14, but after three units of blood

13  here it appears that, instead of going up, the blood level

14  actually went down.

15  Q.   Were you able to opine -- if the hemoglobin is 9.6

16  after they give him three units, what was it before?

17  A.   Well, it may have been 6 or 5.

18  Q.   What would that indicate in terms of whether this man

19  had been -- in terms of life-sustaining ability of blood

20  volume?

21  A.   This man was exsanguinating.

22  Q.   Tell the Court and jury what exsanguinating means.

23  A.   He was bleeding to death.

24  Q.   Finally, there is a record here for the ambulance

25  paramedic, Amy Ellison, at 5:30 indicating an inability to

1  obtain blood pressure.  Is that significant in terms of

2  stability?

3  **A.**    Yes, it is.

4  **Q.**    Why?

5  **A.**    There's not enough circulating volume to create a pulse

6  that you can pick up with a stethoscope or that you could

7  measure in terms of systolic or diastolic blood pressure.

8  **Q.**    How about a pulse rate of 120, labored respirations of

9  34, cold, dry and pale skin, and 93 pulse ox, are those

10  significant in terms of stability?

11  **A.**    Yes, they are.

12  **Q.**    What are they, Doctor?

13  **A.**    First of all, if we could take them one by one, we have

14  a continued low blood pressure and we have a high heart

15  beat, heart rate.  That means that the amount of volume,

16  circulating blood volume is still depleted.  Increased

17  respirations, since the red blood cells are very low and

18  they are carrying oxygen, it takes more effort breathing

19  wise to get more air in to try to oxygenate.  His skin cool

20  or cold and dry, he was shunting all of the blood to

21  maintain vital organs, into the brain, into the heart.

22  **Q.**    At this point I want you to assume the records show

23  that he was bleeding copious amounts of blood oozing from

24  both wounds.  Is that significant in terms of hemorrhagic

25  shock?

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                    31

1    **A.**    Yes, it is because the sort of hemorrhage is continuing

2    in spite of whatever the attempts were to control external

3    bleeding.

4    **Q.**    Now, we have discussed a record at 4:30, 5:05, and

5    5:30.   In terms of a continuum, is this a continuum of

6    stability or instability, Doctor?

7    **A.**    Instability.

8    **Q.**    Is he going up or going down?

9    **A.**    He's going down.

10   **Q.**    Doctor, finally at 5:45 I want you to assume that he's

11   in Botsford Hospital but on the floor of an ambulance, he's

12   still on the grounds.   He's got a 120 pulse rate, 38 now

13   labored respirations, still cold, dry and pale skin, and

14   still a 93 pulse ox.   Is that significant in terms of

15   stability?

16   **A.**    It reflects an unstable state.

17   **Q.**    Doctor, virtually within 10 minutes after leaving the

18   hospital what do the records reflect in terms of his

19   decline?

20   **A.**    His blood pressure continued to spiral downward, and

21   it's my understanding that it was unobtainable in the

22   emergency vehicle.   His respirations became more labored.

23   They were unable to control the external hemorrhage in the

24   ambulance, and it was a gradual deterioration of all of his

25   vital signs and ultimately led to a cardiopulmonary arrest.

1    Q.    When you say gradual, how gradual was it?

2    A.    Well, it was really -- it really started sometime in

3    the emergency room and then continued to about 6:10 or 6:12,

4    very close to Ann Arbor.

5    Q.    At any point before he died was he ever in a stable

6    condition?  Let's start beginning at 4:30.

7    A.    4:30 onward, I doubt it.  When he first hit the

8    emergency room and he was assessed, he had a tachycardia, he

9    had a little hypothermia, his temperature was down a little

10   bit, he did have a pulse rate that was elevated a little

11   bit, but at that time he was not in hemorrhagic shock,

12   although he was being stressed.

13   Q.    Without giving him blood, could he have been

14   stabilized?

15   A.    No.

16   Q.    There is a record in the autopsy that he had

17   31 nanograms of cocaine in his blood, not his urine.  Would

18   you tell us the medical significance of that in Kelly?

19   A.    That would be a trace of cocaine.  We -- I have spoken

20   with our Department of Anesthesia at the hospital where we

21   do the gastric bypass surgery, and we know that patients who

22   have 300 nanograms per ML are not good candidates for

23   elective surgery and they are cancelled.  The 31 nanograms

24   percent is very low and would be considered a trace amount.

25   Q.    How about alcohol, the alcohol?

1   **A.**   Alcohol was 110 and that translates to .08 if you know

2   the formulas, so he's not legally drunk. That's some

3   alcohol in the blood but not a significant amount.

4   **Q.**   I want you to assume that the records show a continuing

5   agitation, confusion, and combativeness. Is that

6   significant in terms of hemorrhagic shock?

7   **A.**   It is.

8   **Q.**   Tell us, is there a relationship?

9   **A.**   There is a relationship. Patients don't become what we

10   call somnolent, they become restless. They develop a

11   paroxysm, which means an opposite of shock. Instead of

12   going to sleep, you actually become more animated. That has

13   to do with a release of adrenaline because the body wants to

14   keep alive. Patients become diaphoretic. Even though the

15   skin is cool, it feels clammy, that all has to do with the

16   release of more adrenaline. This is all consistent with

17   decreased circulating volume.

18   **Q.**   You have talked with Kelly, and you have discussed with

19   us some of the medical conditions that he wished to improve

20   by undergoing the surgery. Did he also discuss with you his

21   aspirations and goals beyond just his medical condition?

22   **A.**   From what I remember, he wanted to get his life back

23   and he wanted to move on. I know as a child he had been

24   belittled for a number of years. In terms of actually any

25   specifics, I don't recall discussing with him any particular

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                                    34

1    aspirations.

2    **Q.**   How about family support?

3    **A.**   My understanding is he had good family support, sister,

4    and certainly there was nothing in his history that would

5    lead me to believe that the family was unsupportive.

6    **Q.**   By the way, finally, in terms of the surgery that you

7    performed on him, does that in and of itself require some

8    self-motivation and some courage to undergo that for the

9    patient?  I mean does the desire in and of itself present

10   that or did you observe that?

11   **A.**   Well, it does.  Certainly because when we go from the

12   size of a football, which is about an 11 or 12 hundred CC

13   stomach to the size of about 1 or 2 CC's, that requires a

14   tremendous modification of one's behavior.  Not everybody,

15   even five, six hundred-pound patients, are willing to

16   undergo that behavior modification.  It's a big step, and it

17   takes a highly motivated patient, and unfortunately most of

18   our patients have tried everything else, but they haven't

19   been successful.

20   **Q.**   You discussed that his sutures broke, and you were

21   required to operate --

22              **THE COURT:**  Are you going to a new subject?

23              **MR. FIEGER:**  I can finish, Judge, before the clock

24   turns 1:00.

25              **THE COURT:**  All right.

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*                    35

1    BY MR. FIEGER:

2    Q.   You discussed a second surgery where stitches broke.

3    Was that a difficult surgery and recovery for this man?

4    A.   Well, it was.  It was very interesting though.  When he

5    separated his incision because of being bounced around in an

6    automobile, when the intestine along with the colon came out

7    through the muscle, it caught on one of our staples that we

8    had put in the week before and for the colon.  So we had to

9    repair the colon and then put all of the intestine back in,

10   take all of the staples out, and then put in these huge

11   retention incisions, which we actually put in with a sewing

12   needle with fish line.  It's that thick.  So our sutures are

13   about this big, and we had to put in eight of them.  Then we

14   had to put the rubber stoppers in so it really looks like

15   the patient has a lobster tail.

16   Q.   Were you able to close him up?

17   A.   We were able to close him up, but not completely, we

18   were able to close the muscle up, because with the torn

19   colon and with the fecal contamination if you close them

20   they will be abscessed.

21   Q.   So how long was his recovery post this surgery?

22   A.   I'm sure it was several months.

23   Q.   In all likelihood by October was Kelly simply at the

24   point where he was just getting over this second surgery?

25   A.   I believe so.

*Andrea Smith, etc. v. Botsford General Hospital, etc.*

1    **MR. FIEGER:**  Thank you, Your Honor.

2    **THE COURT:**  Okay.  9:00 tomorrow morning.  Keep

3    your mouths closed, your ears plugged, your eyes open.

4    Don't talk about this case to anyone.  Don't let anyone talk

5    to you about it.  Think about the Wings, what they are

6    thinking about tonight.  See you tomorrow morning.

7        (Jury out at 1:00 p.m.)

8        **THE COURT:**  Mr. Fieger?

9        **MR. FIEGER:**  Thank you.

10       **THE COURT:**  9:00 tomorrow morning.

11       (Proceedings adjourned at 1:00 p.m.)

12       (End of excerpt.)

13                      -   -   -

14               C E R T I F I C A T I O N

15       I, Sheri K. Ward, official court reporter for

16   the United States District Court, Eastern District of

17   Michigan, Southern Division, appointed pursuant to the

18   provisions of Title 28, United States Code, Section 753,

19   do hereby certify that the foregoing is a correct **excerpt**

20   of the proceedings in the above-entitled cause on the date

21   hereinbefore set forth.

22

23

24

25

*James Sapala, M.D. - Direct*
*Mon./4-14-03/Vol. V*

1        I do further certify that the foregoing

2    transcript has been prepared by me or under my direction.

3

4    _____                 4-28-03
     Sheri K. Ward, RPR                          Date
5    Official Court Reporter

6                            -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Andrea Smith, etc. v. Botsford General Hospital, etc.*